**RANSBURG ELECTRO-COATING CORP., Plaintiff,**

v.

**John SEDLACSIK, Jr. and Interplanetary Research & Development Corp., Defendants.**

**Civ. No. 931-62.**

United States District Court
D. New Jersey.

July 11, 1967.

Pitney, Hardin & Kipp, by Frank C. O'Brien, Newark, N. J., for plaintiff; Olson, Trexler, Wolters & Bushnell, Chicago, Ill., by Richard R. Trexler, Chicago, Ill., of counsel.

James J. Cannon, Glen Rock, N. J., for defendants; Edward F. Levy, New York City, of counsel.

## OPINION

SHAW, District Judge.

This is a civil action brought pursuant to the provisions of 35 U.S.C. § 146 for determination of priority of invention. Plaintiff Ransburg Electro-Coating Corporation is the assignee of patent application Serial No. 306187 filed in the United States Patent Office on August 25, 1952. Harold F. Fruth is the assignor. Defendant John J. Sedlacsik, Jr. obtained Patent No. 2881092 on April 7, 1959. This patent was assigned by him to defendant Interplanetary Research and Development Corporation. The alleged inventions are of a method spray painting process. Upon interference proceedings in the Patent Office, it was held that the interference count asserted on the Fruth application was not supported by the disclosure of the application and, therefore, defendant John Sedlacsik, Jr. and his assignee had priority of invention of Patent No. 2881092.

■■ A question of jurisdiction has been raised by defendants. It is contended by defendants that Harold F. Fruth is an indispensable party. The contention is without merit. Harold F. Fruth has assigned all right, title and interest which he had in his application No. 306187 to plaintiff. An inventor who has assigned all beneficial interest in a patent application is not an indispensable party to litigation arising out of a Patent Office interference proceed-ing. Sylvester v. Jacobsen Mfg. Co., 217 F.Supp. 93 (E.D.Wis.1963); United States v. Washington Institute of Technology, 138 F.2d 25 (3rd Cir.1943). Moreover, the inventor, Hal Fruth, has taken the position that his assignee's claim is without merit. Consequently he could not be heard later to complain about the validity or enforceability of any judgment entered herein.

It would serve no useful purpose to recite the history of proceedings in the Patent Office. This is covered in detail in the opinion of the Board of Patent Interferences in which it was held that priority of invention should be awarded to John Sedlacsik, Jr. An appeal from that decision was not taken in the United States Court of Customs and Patent Appeals and the plaintiff proceeds in this Court pursuant to 35 U.S.C. § 146.

■ The findings of the Board of Patent Interferences cannot be disturbed by the district court "unless there is 'thorough conviction' that a mistake has been made." Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894); R.C.A. v. International Standard Electric Corp., 232 F.2d 726 (3rd Cir.1956). In the latter case the Circuit Court of Appeals stated:

> Then when the question moves to the district court, while the case is heard de novo, we have the strict injunction laid down by Morgan v. Daniels, 1894, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L. Ed. 657, that the patent office's finding is not to be disturbed unless there is "thorough conviction" that a mistake has been made. The force of Morgan v. Daniels has been repeatedly recognized by this Court.

The devices which are the subject of this litigation were conceived as improvements over prior methods of the use of an electrostatic field to deposit atomized paint particles upon a work piece. There is no dispute about the fact that the general principles of atomization in conjunction with the use of an electrostatic field to draw atomized paint

particles to the object to be coated were not novel. The respective underlying contentions in issue as to patentability of method are that the devices in question operate more efficiently in atomization of paint particles so as to produce a better coating of paint than prior devices.

It might be well at this point to refer to the distinction between electrostatic painting and ordinary spray painting. This was described by plaintiff's expert, William L. Smart, as follows:

A. The biggest single difference in electrostatic finishing is that the particles of coating material are charged electrostatically, and because of this charge are attracted to the work piece or the article to be coated and are deposited on this article. If some particles miss the work piece, the electrostatic charge on these particles urges them to deflect in their path and eventually end up on the work piece. Some particles end up on the side of the work piece which is away from the spraying device. This is a characteristic that is known as "wrap-around".

Q. Then if we were spraying a metalized work, a fence, for example, with electrostatic spray painting, as distinguished from ordinary painting, what would happen?

A. With an electrostatic spray gun the entire fence, that is both sides of the fence, could be painted from one side of the fence. Some of the paint would pass through the fence material and turn around and come onto the back side of the fence material. I am thinking of a chain link fence in this instance.

Q. How about the percentage of paint that is just lost in ordinary spray painting? Is that reduced with electrostatic spray painting?

A. Depending upon the particular details of the electrostatic process used, a considerable amount of what would be lost with a conventional spraying system is not lost but is deposited on the work piece.

We are concerned here with the atomization of paint particles entering the electrostatic field. The improvement in method set forth in the Fruth application is captioned "LIQUID FLOW FACILITATING APPARATUS AND METHODS". Pertinent excerpts from the SPECIFICATION are quoted as follows:

This invention relates to apparatus and methods for facilitating flow of liquid materials with a minimum of clogging and more particularly to the prevention of clogging during the discharge of liquid material from a restricted orifice. It is the general object of this invention to produce new and improved flow facilitating apparatus and methods.

A further object of this invention is to produce improved atomizing apparatus and methods. It is another object to prevent the clogging of liquid material flowing through an orifice.

* * * A problem which is common to many liquid flow devices and particularly noticeable in devices used in atomizing liquid material for the spray coating of articles (such as paint and lacquer atomizers) is that of clogging due to the accumulation or agglomeration of the liquid material especially in regions adjacent a site or zone where atomization takes place. The problem is often particularly acute where the liquid material comprises a suspension of solid particles such as the suspension of pigments of the type found in paints. While the particle size of the pigments or other solid particles in suspension may be a good deal less than the smallest dimension of any passage through which the material is moved or of the orifice where the material is discharged (if an orifice be so employed), such particles exhibit a tendency to agglomerate or accumulate together along the walls of the passages leading to the discharge site (especially along curves or turns in such passages) or at the site itself, and during the flow build up into a relatively large lump or clod of more or less solid material which

at least partially blocks further passage of the liquid material or otherwise obstructs or interferes with proper operation.

It has been found that if the discharge site or zone is subjected to vibrations the accumulation or build up of particles at or near the zone can be prevented or at least materially retarded. The vibrations to which the zone is subjected may be subsonic, sonic or ultrasonic, although in general it has been found that when atomization is to take place at the site or zone, the higher the frequency the more effective are the vibrations and thus in most cases it is preferred to use ultrasonic vibrations to prevent or retard the agglomeration of material to be atomized.

Vibrational movement may be applied to the system in a number of ways. In a liquid atomizing device, for example, the vibrations can be transmitted directly to the atomizing zone by a physical connection between the vibration generator and a portion of the atomizing device or apparatus defining or adjacent to the atomizing zone, or the zone may be subjected to vibrations indirectly, as by applying the vibrations to the liquid material itself. By effecting relative vibration between a portion of the atomizing device at or near the atomizing zone and the liquid at or near the zone, an action results which serves to prevent atomizing-inhibiting accumulation or particles of the material.

Such relative movement (herein sometimes termed "scrubbing") can normally be best achieved in practice by applying vibrations directly to an atomizing head portion near the atomizing zone, or to the liquid material at or near the atomizing zone, such as by vibrating a translating member or transducer immersed in the liquid moving to the atomizing zone.

\* \* \* \* \* \*

\* \* \* In electrostatic coating reliance may be had upon electrostatic forces to effect or aid in effecting atomization of liquid material; and where an atomizing blast or jet of air is not employed, the problem of clogging of the atomizing device, particularly at the zone or site of atomization, becomes more acute.

The problem of clogging also arises in pressure type atomizing nozzles where reliance is had solely upon the pressure of the liquid being atomized to effect atomization. In such latter forms of devices atomization is achieved by passing the material through a relatively small orifice which, because of its size, is susceptible to clogging. \* \* \* If the material being atomized includes a suspension of particles, such particles have a tendency to build up at the edges of the orifice and along walls adjacent thereto even though the particle size may be greatly less than the diameter of the orifice or the passages leading to the orifice. Many suggestions have been made as to the reason for this accumulation, the principal one being that the change in velocity of the material during its passage to and through the orifice in effect precipitates the particles. Whatever the reason the particles have a tendency to build up in the passages and at the orifice and thus clog the same. The clogging necessitates frequent shut downs of the nozzle in order to clean out such accumulations.

To prevent such clogging, means are provided for vibrating the material at and adjacent the orifice, such means being in the form of a needle 16 extending through the chamber 11 and terminating within the orifice 13. The needle extends outwardly through an opening 17 and is secured to an electromagnetic vibrator 18 which vibrates the needle. Electromagnetic vibrators of the type shown are capable of producing subsonic or sonic vibrations. It has been found that by vibrating the needle the aforesaid accumulation of particles is retarded to a great extent and thus the device may be operated for longer periods without having to be shut down for cleaning.

\* \* \* \* \* \*

While the embodiments of the invention just described employ subsonic or sonic vibration, it has been found that even

better results can in most cases be achieved by employing ultrasonic vibrations. * * *

In operating the device shown in Fig. 4, material to be atomized is supplied to the chamber 34 and formed into a film between the portion of the supporting plates forming the passageway 35 for electrostatic atomization from the edge of the film as it reaches the orifice 36. By operating the ultrafrequency vibration generator during the atomization it appears that a high frequency, low amplitude "scrubbing" action is obtained between the faces of plates 31 and 32 defining passageway 35 and the liquid which serves to retard or even completely prevent the accumulation of material or particles adjacent the passageway and orifice. * * *

* * * * * *
* * * [W]here an electrostatic atomizing device having an extended atomizing zone * * * is employed, it is preferable to use ultrasonic vibration. When atomizing devices of this nature are employed for painting or lacquering of articles, even a slight accumulation of particles into a lump at the orifice which is subsequently freed (by vibrations or otherwise) produces an undesirable lump of pigment on the article being coated. To prevent accumulations of this nature the vibrations should be relatively intense and frequent. Where the sole desire is to prevent complete clogging at or adjacent a discharge orifice and where slight variations in the quantity of material discharged are of no moment, sonic or even subsonic vibrations may be employed. In the latter instances it may be immaterial that a relatively large "slug" of the material or of the particles be periodically discharged and thus simple sonic or subsonic vibrators may be used.

While the invention has been shown and described in several embodiments, such embodiments are to be considered exemplary only and no undue limitations should be construed therefrom.

The Sedlacsik patent is described as a "SPRAY DEVICE ACTUATED BY SUPERSONIC MEANS". Claim 7 of that patent was the ground of the Fruth interference. Claim 7 reads:

The method of liquid coating with adjuvent electrical forces, including the steps of discharging the liquid into air in the form of a thin flat film, supersonically vibrating said film, and simultaneously applying thereto a high voltage gradient in the direction of an object to be coated.

The claim defines a method of electrostatic coating with adjuvant (helpful) forces comprising three steps:

1. Discharging the liquid into air in the form of a thin flat film.
2. Supersonic vibration of the film.
3. Simultaneously applying thereto a high voltage gradient in the direction of the object to be coated.

Vibration to atomize the paint particles occurs in the closed chamber of the Fruth device at or near the slit-like orifice from which the spray is projected into the electrostatic field. In the Sedlacsik device there is a spray nozzle or head through which paint and air pass from a chamber projecting the coating material in a thin flat film on an open pan rigidly attached to the head or nozzle. The open pan is supersonically vibrated to cause atomization of the coating material in air and resulting projection thereof in the form of a spray mist into the electrostatic field. Plaintiff contends that supersonic vibration in the Fruth device chamber at or near the terminal slit-like orifice will accomplish atomization of paint particles as effectively as the Sedlacsik device. Defendants contend that such vibration in an enclosed chamber will not cause emission of a spray mist into the electrostatic field. They urge that this can only be accomplished by the supersonic vibration of a thin flat film of paint on an open pan. Moreover, defendants contend that there has never been a demonstration of the Fruth device which corroborates plaintiff's contention.

Plaintiff attempted at trial to demonstrate by pictorial results of vibration of a hypodermic needle that the same type of atomization would occur in operation of the Fruth device. On the other hand, defendants' exhibits actually show pictorially a mist rising from the pan surface of the Sedlacsik device when in operation.

Looking merely to the language of the Fruth SPECIFICATION and Claim 7 of the Sedlacsik patent, it is arguable that the Fruth SPECIFICATION is sufficiently broad to infer a method claim such as is described in Claim 7 of the Sedlacsik patent. It is true that in the Fruth SPECIFICATION the emphasis is upon prevention of "clogging", but then there is reference to that feature as "another object". There is also reference in the SPECIFICATION to use of ultrasonic vibration of the fluid to cause atomization. If the ultrasonic vibration of the fluid within the chamber of the Fruth device not only operated to prevent "clogging" but also resulted in emission of spray into the electrostatic field similar or identical to that by the Sedlacsik method, then there would be no ground for a valid distinction between methods. The situation would merely be one of a different embodiment of the same invention.

During trial the Court was concerned with what it first thought was a fine distinction drawn upon a reading of the Fruth SPECIFICATION and a reading of Claim 7 of the Sedlacsik patent and was inclined to feel that the Sedlacsik device might be considered merely as a different embodiment of the same principles of function as outlined in the Fruth SPECIFICATION or, at best, some improvement accomplished by the use of the open pan rigidly attached to the nozzle of the Sedlacsik device. Defendants' expert, S. Irving Weiss, oriented the Court's thinking on that by a very cogent answer to a question of the Court quoted as follows:

THE COURT: Just one further question, wouldn't it be true, however, that the novelty, the novelty of impelling a vehicle by a gasoline-driven combustion engine comes into existence at the time that that is conceived? Improvements upon it for better performance do not add to the novelty of the basic principle.

THE WITNESS: Your Honor, I don't mean to be facetious, but I have a beauty for you.

THE COURT: All right. Go ahead.

THE WITNESS: You recall Jules Verne wrote a marvelous book and described a submarine. Modern manufacturers never came close, the Nautilus, and the chap built—or Buck Rogers, if you recall—I do, as a boy—that he had an astronaut out in space with an umbilical cord tied to him. That was back in 1925. We just saw it recently. The thing is, to dream up an idea and to put it in actual practice are worlds apart, and that is one of the things that even in my own patents I am very careful. The principles I outline are solid, and they are not just paper. They work. I personally have small sympathy for dreamers. There are so many dreamers and fellows that do write patents that have never been done, and if they are done, they don't know how to do it, and then we have these arguments like this.

Forgive me.

Plaintiff's expert testified that the Fruth device would function as effectively as the Sedlacsik device, but his testimony was not corroborated by any demonstration. The attempt at trial to create an analogy by use of a hypodermic needle was not persuasive. If the theoretical Fruth device did indeed produce the film or atomized mist to be projected into the electrostatic field, then it was incumbent upon plaintiff to illustrate the fact in this Court. It certainly would have been of great probative value if plaintiff could have produced pictorial illustrations of one of the Fruth devices functioning. On the other hand, defendants' expert testified that it was

not possible for the Fruth device to discharge a thin flat film into air and atomize it in air so as to create the finely atomized mist spray accomplished by supersonic vibration of the open pan in the Sedlacsik device. It is true that if the open pan was nothing more than a mere extension of the spray head designed for more effective movement of a finely atomized spray to the edge where it would be projected into the electrostatic field, then it could be said that the structure and manner of operation of both devices were not so dissimilar as to rule out plaintiff's theory of "inherent" similar function of the Fruth device. By advancing the "inherent" theory of operation of the Fruth device, plaintiff tacitly admits that the language of the Fruth SPECIFICATION is not sufficiently specific to spell out the method set forth in Claim 7 of the Sedlacsik patent. And plaintiff has not demonstrated by the evidence that Fruth had conceived or intended by the language used in his SPECIFICATION to describe the Sedlacsik method. Cogent proof of such conception and intent would exist if it had been shown by plaintiff upon demonstration of the Fruth device in operation that it had the same or similar atomizing potential as the Sedlacsik device[1].

It is well settled "that one who extracts claims from an issued patent for the purpose of securing an interference must show clear prior disclosure, Brand v. Thomas, 96 F.2d 301, 25 C.C.P.A., Patents, 1053, and in such a case any doubt as to an applicant's right to make the copied claims must be resolved against him." Bierly v. Happoldt, 201 F.2d 955 (C.C.P.A.1953).

The burden of proof is upon plaintiff to establish "thorough conviction" that a mistake had been made by the Board of Patent Interferences and this burden has not been met.

Accordingly the decision of the Board of Patent Interferences will be affirmed. Nothing herein contained shall be construed as any finding by this Court of the state of the prior art with respect to either the Fruth application or the Sedlacsik patent. The matter of prior art is not in issue.

An appropriate order for entry of judgment will be submitted.

---

[1]. The Court has considered the Juvinall affidavit marked Plaintiff's Exhibit 3 in evidence and the pictorial views of the experiment he alleges that he conducted and has reached the conclusion that even if the findings had probative value, it would not be a substitute for actual demonstration of the Fruth device, particularly as opposed to the testimony of defendants' expert that upon actual operation of defendants' model of a Fruth device the atomizing result accomplished by the Sedlacsik device was not shown.